Good morning, Your Honors. May it please the Court, my name is Joe Luciano. I would like to reserve five minutes for rebuttal. We represent the appellants, in this case MDLCapital Company and three of its officers and directors, individuals with the names Mark Lay, Ed Adetepi, and Steve Granting a summary judgment to Federal in this case on the basis of a to be determined undefined exclusion in an E&O policy failed to follow the fundamental principles of Pennsylvania law that exclusions are to be narrowly construed for coverage, they're to be construed in favor of coverage, they're to be construed against the insurers, the insurer who drafted them, and any ambiguities are to be resolved in favor of the insured, in this case our clients. There are two policies at issue. You're not arguing that we should resolve that in your favor at this point, are you? You're just arguing that it's ambiguous and that some court should take another look at it to determine what the true meaning is? I believe, Your Honor, if you look at the facts of this case, we believe we're entitled to summary judgment on that exclusion. We believe the facts, the undisputed material facts, we believe the principles of law indicate that we should have been granted summary judgment, that that exclusion does not apply. When the statement says to be decided or endorsed to be developed, how can we at this point say who should develop that endorsement? Your Honor, the undisputed material facts in this case, we believe, demonstrate that what was agreed to between these parties was that those three funds that are referenced there, which in reality are only two funds, were out of existence. Well, one had ceased to operate. The other two were really the same fund with a different name, and they put all three funds into that exclusion. What we believe and what the contemporaneous evidence from the underwriting submission shows is that our client had agreed with the insurer in this case that those funds would be excluded, and the title of that exclusion is a private fund exclusion. It's not a professional services for private fund exclusion. It's a private fund exclusion. So we believe, and in fact the court in its opinion said just that. If you read the exclusion, what it excludes is coverage for the three listed funds, which are separately incorporated legal entities separate and apart from the insured parties, in this case MDL and its three officers and directors. But there's deposition testimony going both ways as to what the meeting, the lack of the meeting of the minds was at these various meetings. The one side saying, well, of course we intended that as an entity it would be excluded, and the other saying, well, of course, you know, anything relating to that was going to be excluded. So isn't there at least an issue of fact? Your Honor, even if there is an issue of fact, Pennsylvania law on the exclusions is that an ambiguity must be resolved in favor of the insurance, in the insurance, that would be our client. So if there's any ambiguity in that, in the facts and in how the issue is resolved, that ambiguity must be construed in favor of our client. So if any ambiguity goes in our favor, the exclusion doesn't apply, we should have been granted summary judgment. But isn't there a difference between the concept of ambiguity in the language as written and the reasonable expectations of the parties as to what that language meant? Well, the reasonable expectations of the parties is a doctrine under Pennsylvania law. There is a doctrine called reasonable expectation of the insured, that is our clients. And the testimony in this case is undisputed as to what our reasonable expectations were. Our clients... Well, or whether it was reasonable, depending upon what the others thought as well. There's no evidence to the contrary that our client's reasonable expectation was what they had asked for was complete coverage in this policy for all of their professional activities, whether to a fund, to a non-fund client, to any client. And that was what we communicated to federal during a single underwriting meeting we had. It's what our broker confirmed with them. And it's what the facts demonstrate that that was our reasonable expectation. And there is no contrary evidence to that testimony of our clients from our perspective, such that the doctrine that would be applied in this case would apply that our reasonable expectation should be upheld because there's no evidence in the binder itself that's contrary to that reasonable expectation. In other words, the referenced exclusion there that's a, and I emphasize, private fund exclusion, does not conflict with our client's reasonable expectation that the only thing it had agreed to and had understood from its meetings with federal was that the funds as separately insured entities would be excluded, but that our professional services that we perform for any client, whether it's a fund or not, would not be excluded and would be expressly covered. So that doctrine we think supports our position in that regard. And with respect to the trial court's decision, on the one hand the trial court said they agreed with our reading of the exclusion as it was referenced that it only excluded the coverage for the funds itself, but then the court wrote an exclusion. It added in the phrase professional services, which was nowhere referenced in any language of the binder. It was nowhere referenced in the exclusion that was listed there and was not referenced in any writing that they gave to us. The same thing goes for adding the related to language. There was no reference in the exclusion that was referenced in the binder to quote-unquote related to. There was no reference in the binder that said that related to was a phrase that should be added to that exclusion. And if you read the cases that were cited by federal, there's no case that supports that. There's not a single case in Pennsylvania law. Indeed, I don't think there's a case anywhere in the United States that says when you have an exclusion that has the title broad private fund exclusion and it lists three funds, that that automatically means that you add into that words related to. So we think that the court's writing of an exclusion that's not supported by the binder itself and by the exclusion and or by any case law was contrary to the fundamental principles of Pennsylvania law that the exclusion must be first of all construed against federal, second of all must be construed in our favor, and thirdly must be narrowly construed. And if there's an ambiguity it should be resolved in our favor. Now there's, isn't there deposition testimonies from federal's representatives that MDL had been told repeatedly that federal would not cover any investment advisory activities related to ADF? That was federal's underwriters testimony, correct. Okay, so when they testified to that, doesn't that create an issue as to how much coverage for anything related to ADF? If you look at the actual underwriting submission, the written documentation that that underwriter wrote immediately after the underwriting meeting, what it says, and I'll quote, it's on page A1025 of the record, it says, based on the meeting we had with the account last Thursday, that was April 28, 2005, I think we can eliminate coverage for the mutual fund. It was discovered that they have coverage with both AIG and under a master program with SEI. Due to the issues the fund is having, it was recommended that they continue coverage with SEI and exclude it under this policy. So if you read the contemporaneous written statements of that underwriter, they're very consistent with our client's view that the only thing that was discussed was we exclude the mutual funds as separately insured entities, and we have coverage for everything else. And there's no contrary statement in any of those contemporaneous written statements. But there is deposition testimony that creates an issue, whether you think that that undercuts it or not. I agree there's deposition testimony that the underwriter did say that, and we believe there's a conflict on that, which was another reason that we believe the court should not have granted summary judgment to federal on that issue. But we don't think that issue matters, because when you look at what the terms of the exclusion are, an ambiguity must be construed in our favor. So even if some testimony somehow creates an ambiguity as between this whole transaction, that ambiguity has to be resolved in our favor. And that's basically our view of it. If there are no other questions, I will defer to Mike. You reserved a lot of time for rebuttal. All right. Good morning, and may it please the Court. My name is Daniel Standish, and I represent Federal Insurance Company. First of all, let me make clear that the written record and the documentation of the agreement between the parties here, the conditional binder, left no room for ambiguity as to the meaning of this exclusion. The conditional binder specifically identified the investment advisor policy form that would be used on the policy. That investment advisor policy form had an insuring clause that only extended coverage to claims against insureds for wrongful acts arising out of their professional services. That term was defined in turn as professional services as an investment advisor. Investment advisor was defined by reference to the Investment Advisors Act of 1940. That was the only insuring clause in that part of the conditional binder. It's axiomatic that an exclusion can only negate coverage that otherwise exists in the coverage grant. In the context of that coverage clause, the exclusion that was listed on the binder, the broad private fund exclusion with the reference to the three funds, could only mean that it would negate coverage for professional services with respect to those three identified funds. Now the alternative... What does that mean? Professional services with respect to? I mean, there could be suits by ADF against MDL because there was an investment advisory agreement between MDL and ADF. There could have been suits against ADF. There could have been suits relating to ADF. What is a professional services? I mean, what does it mean? That question, Your Honor, is answered by the use of the term broad in the description of the exclusion. It's unrebutted that that's a term of art in the insurance industry. A broad form exclusion is an exclusion based on arising out of or related to the subject matter of the exclusion. But your policy says, the binder rather, says the endorsement, the titles and headings are for convenience only. Please refer to the policy for a description. So you're taking a title and making it part of the policy. That's not what your binder says. We were constrained to refer to the terms of the binder because the policy's never issued. The binder was conditional. The insureds owed information to federal that was never provided. That's a different matter, though, isn't it? Well, it explains why we have to look to the terms of the conditional binder itself as informed by the policy forms that are referenced in order to give meaning to that term. It doesn't mean you get to just ignore the exclusion. It's undisputed that the parties agreed to an exclusion. Even MDL has not argued that no exclusion exists. They agreed to agree. Well, there's no doubt that the binder incepted on May 19th, and that was a term of the conditional binder, subject to the provision of additional information. You lost me there. Let me try to explain it a little bit differently. The only evidence we have of the agreement between the parties as of that date is the terms of the conditional binder itself. The description of that exclusion is what we have to use as informed by the terms of the policy form that was identified expressly in the conditional binder. All right. Now, where in the policy referred to in the binder is there any information on what a broad private fund exclusion MDL is? That specific wording had not yet been developed at the time the conditional binder was issued. Was there any agreement on that point? Yes, we believe that there was, Your Honor. And let me speak, too, because I think this goes to an issue that Judge Rendell raised about what the deposition testimony was. There was a meeting between Federal's underwriters and MDL's representatives on April 28, 2005. Both the Federal's underwriters testified unequivocally that they stated on at least two separate occasions during the course of that meeting that we will not insure the funds or any activities related to the funds. And that's the term that became embodied in the binder. The two witnesses from MDL who were there. Where was that embodied in the binder? The term of the binder itself, the description, broad private fund exclusion with a reference to the three identified funds. But your binder says there for convenience only that please refer to the policy for the meaning of it. The description, again, Your Honor, we only have the conditional binder because the policy never issued because of MDL's failure to provide information to Federal. You'd be penalizing, in essence, Federal for the lack of issuance of the policy simply because MDL never came up with their fiscal year 2004 financials. You're wandering off the point. That has nothing to do, does it, to the exclusion itself? My point is that because of the state of the underwriting process at the time the binder issued and the time the claim arose and the fact that MDL had not satisfied all of the contingencies in the binder, the evidence that we have of the party's agreement, which was not only in the quote for insurance that Federal provided on May 5th, 2005, but also in the binder issued effective on May 19th, 2005, expressly referenced that exclusion. The only sense that that exclusion makes in the context of an investment advisor form that affords coverage for professional services as an investment advisor is an exclusion that precludes coverage for investment advisory services with respect to those three listed funds. Let me address the alternative argument that MDL has posited. That argument is that this exclusion was only intended to bar coverage for the funds themselves. That argument doesn't apply because the funds themselves are not even covered under the investment advisor policy form that was identified in the binder. The insured organization is identified as the insured parent organization and any subsidiary of the parent organization. Well, that may be so, but the application that you accepted was the application for ACELIC. And there's ample evidence in the record that what they were doing was trying to match the previous insurance but alter the fact that ADF had been covered under the previous one. So there's plenty of evidence that ADF had been covered before as an entity and the desire was not to cover them under the new policy. Isn't that correct? The ACELIC application did not even reference the active duration fund. That's correct. But the previous insurance that they had with ACELIC did have ADF as an insured. Is that not correct? That's correct. It was added by endorsement to that policy. There was a discussion, and this is undisputed. There was a discussion at the April 28, 2005 meeting about whether or not MDL had alternative coverage for the funds. And the conclusion was that there was alternative coverage from an entity called SEI, which is basically an administrator for mutual funds. And at that point, the federal underwriter indicated, well, we're willing to extend coverage, but we don't feel comfortable with the risk presented by the mutual funds. The Morningstar rating for the one fund that was still in existence was extraordinarily small. So federal's willingness to go forward was predicated on the notion that it would not extend investment advisory services for the funds. There's an alternative basis on which to affirm the district court's judgment, and that's the warranty exclusion contained in the application. There was a question in the application whether any insured had knowledge of facts or circumstances that might give rise to a claim. And if such knowledge existed, and any such claim arose out of such facts and circumstances, then no coverage for any ensuing claim would exist. What evidence do we have on that point? On the knowledge of facts and circumstances that might give rise to a claim? Let me tell Your Honor what's in the record, and let me also describe a development that occurred two days ago that bears on this issue. First of all, in the record, it's undisputed that by the end of 2003 and early 2004 Let me ask you a question. The district court did not take this up, did it? The district court did not reach this issue. It was fully briefed, however. So for that reason, we feel this court can reach the issue to affirm on alternative grounds. The undisputed record evidence indicates that by late 2003, early 2004, Mr. Adetepi, who's one of the appellants here, sharply questioned Mark Lay about his use of leverage in the funds. I think the words he used were, Please, for the love of God, Mark, will you assure me that you're not exceeding the leverage guidelines with respect to these funds? In May of 2004, it's undisputed that at the board meeting for the Active Duration Fund, one of the directors on the board questioned Mr. Lay and expressed concern about the extent of leverage that he was using and whether it was really consistent with the guidelines for the funds. As a result of that, he asked, and Mr. Lay agreed, to go to the Ohio Bureau and change the leverage guidelines or seek a change in the leveraging guidelines for the fund, which by that point was starting to lose money. Mr. Lay, it's undisputed, goes to the Ohio Bureau and asks them to agree to a change. They refuse. They say, We are not going to change the terms of the private placement memorandum, which limited leveraging to 150%. And by this time, Mr. Lay had exceeded that guideline on numerous occasions. The showdown comes on October 27, 2004, when the Active Duration Fund board meeting occurred. And this is all contained in minutes that are undisputed. It all occurred in the context of a board meeting in which Mr. Lay, Mr. Sanders, and Mr. Adetepi are listed as participants on the board meeting. There's no dispute that they participated. The fund directors sharply questioned Mr. Lay about his trades. They're characterized in the board minutes as highly unusual. They asked Mr. Lay what authority he had for continuing to trade at those leveraging levels when the Ohio Bureau had already indicated that they wanted to close out the investment. There was an express discussion, and this is particularly important for purposes of this exclusion, an express discussion, and it's contained in the minutes to the effect that the board discussed the potential liability of the Active Duration Fund, its board members, and MDL as the investment manager. When was that, October of 2004? October 27, 2004. The application that was submitted to federal was dated, I believe it was March 13, 2005. It was well in advance. Moreover, within just a couple of days of that meeting, a letter from a law firm representing the Bureau came in to MDL and asked for any evidence whatsoever that there had been an agreement on the part of the Bureau to exceed the leveraging guidelines that were contained in the private placement memorandum. Accountants were hired by the Bureau at the end of the year to investigate their investment in the fund. At the close of the fund, it had lost $216 million of the $225 million contained in the fund. If that's not facts and circumstances that might give rise to a claim, I don't know what is. They argue that there's plenty in the record to the contrary, though, saying that the guideline, 150% leverage was a guideline, could be changed, that they kept them informed, that it was normal to request documents, and the audit was standard operating procedure. I mean, there are things going the other way. Isn't this the kind of thing that's a classic to, since the district court didn't consider it, for the district court to decide in the first instance whether this would fit within that? Well, we submit that the evidence is clear, and I don't think that there is a factual dispute as to what they knew. And under this court's seminal decision in Selka, which basically laid out the framework for how you interpret or apply these prior knowledge exclusions, all that the insurer has to establish is subjective knowledge on the part of the insured of the facts or circumstances that might give rise to a claim. The next inquiry is an objective one, and that's one that a court readily can make. Are these facts and circumstances that a reasonable person would believe? And the phrase is, not give rise to a meritorious claim, but that might give rise to a claim. The issues that MDL raises on that topic all go to the merits. They claim, well, we really didn't think we were doing anything wrong, we had some flexibility, but the raw facts in the face of challenges from numerous sources over what they had done, the sheer magnitude of the loss, and the fact that the board of directors of the Active Duration Fund itself had discussed potential legal liability arising out of these circumstances. Council's strongly in favor of the conclusion that this exclusion applies with respect to all of the coverages. Briefly, with respect to a development that just occurred two days ago, Mr. Lay was indicted with respect to his activities on the Active Duration Fund after the appellate briefing closed. A jury returned a conviction of Mr. Lay two days ago on four counts, one for investment advisory fraud, one for conspiracy to commit mail and wire fraud, and two counts of mail fraud. Under this circuit's precedent, we are entitled to bring to this court's attention developments in the criminal action, and this court can take judicial notice of them if they occurred after the briefing closed. And once we have the documentation documenting the verdict, as well as the jury instructions and the like, we think that that's material to the warranty exclusion question for this court to determine in the alternative. Although we don't know all the facts and circumstances on which the jury rendered a verdict, you know, it's one thing to say this happened, but it's another to say that that is proof positive of a subjective knowledge at a point in time. We believe that the conviction will be essentially collateral estoppel on those issues. I mean, the arguments that the government made in that case were that Mr. Lay had improperly overreached with respect to the leveraging, that he improperly concealed it from the Bureau. Those are the facts and circumstances that are at issue in the underlying civil litigation that the Bureau filed against Mr. Lay that are the subject of the insurance claim at issue in this lawsuit. Thank you. Counsel, could you address the last issue first? I think that one of the key aspects here is that that warranty provision talks about facts or circumstances which might give rise to a claim as compared to which would be expected or anticipated or, I mean, the word might it's like the SELCO, it's the reverse of the SELCO standard basically the same thing. Might is a very, very wide, open concept. I understand. We did address this in our briefs in the trial court, in extensive briefing, which I was not able to respond to because of page limitations in this case. But we have, we essentially dispute the facts as to whether this might have led to a claim. And I need to focus you on everything Mr. Standy set up here related to board of directors of the ADF. The ADF has not been insured in this case. We've all agreed with them during underwriting meetings that they would not be insured. What we're talking about here is MDL and it's officers. That's Mr. Lay, Mr. Stevens, and Mr. Adetepi. And the testimony is unequivocal that MDL did not have any discussions of any kind of liability like this during its board meetings. That Mr. Lay was firmly of the view that the private placement memorandum that applied to this fund gave him discretion to do the types of leveraging that he did. His testimony is also Bureau and it's personnel informed at every stage of the case. And a very significant point is that as of October 2004 when this fund closed the Bureau continued to invest $164 million with MDL. And in fact not only continued in October but continued all the way up through after this binder was issued to invest that $164 million with them. We don't know why. We don't know whether they would have suffered adverse consequences if they shifted it. We don't know whether they decided to do that even though they might bring a claim. Although we don't need to look at their subjective intent, do we? Well, that's exactly right. That's why this should have been an issue of fact for the trial court to decide. Because there are a lot of disputed issues on that point as to why they kept it there. Our view of it, our understanding of it was they kept it with us because we were their trusted advisor. And these funds, this ADF fund was an overlay strategy with what he called with what MDL called a long bond fund. So when the ADF fund lost money, the long bond account made money. So Mr. Lay was of the view that he was doing what the Bureau wanted him to do, which is hedge against drops in the long bond account, which would mean the ADF fund would go up and vice versa. So when he, his testimony and the other testimony of the MDL representatives is they were absolutely shocked when the department gave them the notice that they were going to withdraw these funds and then filed suit a few days later. Up to that point in time, they had a very close working relationship with the ADF, with the Bureau, and they had continued to work with them, managing their investment accounts and long bond account as well. Well, how about the conviction and presumably if we were to look at the findings of the instructions to the jury and what was placed before them, should we not consider what was found there as evidence of knowledge of facts and circumstances? Well, I need to be very careful in the use of the word conviction. As I'm sure this court knows, there's no conviction until a sentence is entered. And in this case, what we have is a Wait a minute, there was a conviction though, right? By the jury? There was a trial court verdict. And the judge, as we understand it, we were not involved with that case, but as we understand it, the judge has invited Mr. Lay's counsel to submit a motion to set aside the verdict and has given him time because there are issues. There are issues, evidentiary issues, there's issues on jury charges. There's not going to be a conviction until a sentence is entered, and even after a sentence is entered, it's our expectation that there's going to be a substantial appeal on this case. So there's a lot of facts as to what MDL subjectively believed or felt or knew as to whether the Ohio Bureau would bring a claim as of the time this binder was issued in March of 2005. He cited all evidence about ADF. On the MDL side, MDL's position and view and understanding was always there was really no legal basis for the department to assert a claim. And in fact, the department's conduct with them made it clear that they didn't want to assert a claim or weren't going to assert a claim and didn't have a claim. But given this issue, wouldn't it be pretty difficult for us to give you summary judgment on coverage based on the first issue, actually? Both of these should... Well, I believe we're entitled to coverage. If they can rescind the policy in the binder on the basis of this evidence, they're entitled to do that. But we, under the terms of the policy, we believe we're covered. Well, but if there's an exclusion, I mean, if this warranty, if you're not entitled to coverage because you knew of facts which might give rise to a claim, then it wouldn't be covered. Well, that only... It only wouldn't be covered... Well, on the warranty exclusion, on the application warranty exclusion, I would say that's correct. That's correct, Your Honor. You're correct. Alright, thank you. The case was well argued. We'll take it under advisement and ask the court to recess court. Thank you, Your Honor.